KAVANAUGH, Circuit Judge,
with whom Chief Judge SENTELLE and Circuit Judges HENDERSON and RANDOLPH join,
dissenting:
On a December night in 2003, a D.C. police officer stopped Paul Askew on a Washington street based on reasonable suspicion that Askew had just committed an armed robbery. Consistent with Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police attempted to frisk Askew to ensure he was not carrying a weapon. After Askew resisted the frisk and the robbery victim arrived for a show-up procedure, the police partially unzipped Askew’s outer jacket and discovered he was carrying a loaded .38 caliber gun. Because Askew was already a convicted felon, he was prosecuted in U.S. District Court for being a felon in possession of a firearm. After the District Court denied Askew’s motion to suppress and ruled the gun evidence admissible, Askew pled guilty, reserving his right to appeal the Fourth Amendment issue.
In this Court, Askew accepts that the initial stop was lawful under the Fourth Amendment. Askew also acknowledges that the police could frisk him for purposes of officer safety. But Askew contends that the police exceeded the scope of a permissible Terry frisk by partially unzipping his outer jacket, which in turn revealed his gun. He argues that the gun evidence therefore must be excluded.
We would uphold the search and affirm Askew’s conviction for either of two alternative reasons. First, after Askew actively resisted and impeded the police’s initial frisk attempt, unzipping Askew’s outer jacket to search for a weapon around his *1150 waist area was an objectively reasonable protective step to ensure officer safety. Second, the police may reasonably maneuver a suspect’s outer clothing — such as unzipping a suspect’s outer jacket — when, as here, doing so could help facilitate a witness’s identification at a show-up during a Terry stop.
Before explaining why we would affirm Askew’s conviction, we point out that the legal import of today’s long-pending and badly splintered en banc decision turns out to be zero.
On the protective search question, all 11 members of the en banc Court agree on the settled legal principle that “a protective search may be lawful when a suspect prevents the police from performing a Terry frisk.” Maj. Op. at 1144. But Part III(E) of Judge Edwards’s opinion, which on this point is for a majority, concludes as a factual matter that the police here did not have an objective basis to unzip Askew’s jacket as a protective step. Our difference with Part III(E) of the majority opinion is entirely fact-bound and depends solely on our different reading of the suppression hearing testimony and the District Court’s opinion.
On the show-up issue, there is no majority decision either way on the legal question that we granted en banc review to decide: whether the police may reasonably unzip a suspect’s outer jacket to help facilitate a witness’s identification at a show-up during a Terry stop. Unlike the other nine judges on the en banc panel, Judges Ginsburg and Garland have not reached that legal question: In their view, the facts of this case do not present it. They thus do not join Part III(A)-(C) of Judge Edwards’s opinion on the show-up issue; but they also do not join Part 11(B) of our opinion. On the show-up issue, they join only the single, fact-bound paragraph in Part III(D) of Judge Edwards’s opinion, thereby making Part III(D) the entirety of the majority’s opinion on that issue. That paragraph assumes arguendo that the police may “unzip a suspect’s jacket to facilitate a show-up if, inter alia, ‘there is a reasonable basis for believing’ that doing so ‘will establish or negate the suspect’s connection with the crime’ under investigation.” Maj. Op. at 37 (quoting Hayes v. Florida, 470 U.S. 811, 817, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (alteration omitted)). But Part III(D) finds on the facts of this case that the police did not have a sufficient factual predicate to unzip Askew’s jacket.
The fact-based approach of Judges Ginsburg and Garland, as reflected in their joining only Part III(D) of Judge Edwards’s opinion on the show-up issue, is the narrowest ground necessary for reversing the conviction and thus constitutes the binding expression of the en banc Court on that issue. Cf. Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). As a result, there is no decision of the Court with respect to the legal question that was decided by the divided three-judge panel and listed without dissent as the only issue in the order granting en banc review. That question will remain unanswered in this Circuit and will have to be decided anew in future cases by other district court judges and three-judge panels of this Court, and perhaps ultimately by another en banc panel. For purposes of future decisions on the show-up issue, in other words, Part 111(A)-(C) of Judge Edwards’s opinion and Part 11(B) of our opinion carry equal prece-dential weight, which is to say they carry no precedential weight at all.
I
At about 11:00 p.m. on December 19, 2003, minutes after an armed robbery in Washington, D.C., a police dispatcher broadcast the location of the crime and the victim’s description of the armed robber, saying among other things that the perpe *1151 trator was wearing a blue sweatshirt. Metropolitan Police Department Officer Bowman then stopped Paul Askew on a street near the robbery because Askew appeared similar to the radio description. After Officer Bowman stopped Askew, Officers Willis and Koenig arrived at the scene and decided to frisk Askew “for officers safety” and “to make sure he wasn’t armed or anything.” Mar. 26 Tr. at 6. Consistent with Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Officer Koenig directed Askew to put his hands on the police car and then tried to frisk him. Mar. 26 Tr. at 6-7. But according to Officer Willis, as Officer Koenig attempted to frisk Askew “towards his waist” and then “continued to try to pat him down,” Askew “kept leaning up against the cruiser that his hands was on.” Id. at 8, 88 S.Ct. 1868. (The two other officers who testified at the suppression hearing also stated that Askew was uncooperative at various times during the encounter. Mar. 10 Tr. at 17, 40-42, 47.)
According to Officer Willis, while Officer Koenig was attempting to conduct the frisk and Askew was resisting, the robbery victim arrived in another police car for a show-up. Mar. 26 Tr. at 8. Officer Willis turned Askew around so that the robbery victim could see him. Id. Officer Willis remembered that the police dispatcher had said the robber was wearing a blue sweatshirt. Id. Officer Willis stated that he “wanted to expose the blue hooded sweatshirt to the victim to make sure that that’s what she saw.” Id. at 9. He therefore partially unzipped Askew’s outer jacket so that the victim could get a better view of Askew’s clothing, specifically the blue sweatshirt underneath Askew’s outer jacket. Id. at 8-9. At that point, Officer Willis did not know whether the show-up witness had identified Askew as the robber. Id. at 18-19. The unzipping of Askew’s jacket revealed his loaded .38 caliber gun. Id. at 9-11.
Askew was prosecuted for being a felon in possession of a firearm. Askew moved to suppress the gun evidence, arguing that the police violated the Fourth Amendment when they unzipped his jacket during the show-up. The District Court rejected Askew’s argument, explaining that partially unzipping Askew’s jacket reasonably facilitated the show-up by allowing the witness to obtain a better view of Askew’s clothing. United States v. Askew, 313 F.Supp.2d 1 (D.D.C.2004) (Friedman, J.).
II
The Fourth Amendment provides: “The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” U.S. Const, amend. IV. As the Supreme Court has explained, the text of the Fourth Amendment does not prohibit all searches and seizures without probable cause and a warrant. Rather, the “touchstone of the Fourth Amendment is reasonableness.” United States v. Knights, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).[1]
Reasonableness “is measured in objective terms by examining the totality of the *1152 circumstances.” Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). The test “balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.” United States v. Hensley, 469 U.S. 221, 228, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); see also Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Terry v. Ohio, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
The Supreme Court has conducted the Fourth Amendment reasonableness inquiry in common-law fashion and has developed rules and standards for different categories of search-and-seizure situations— including “the quantum of evidence needed for certain distinct kinds of official action.” 4 Wayne R. Lafave, Search and Seizure § 9.1(e), at 279 (4th ed.2004). In some categories, the Court has required individualized probable cause, usually supported by a judicial warrant. In situations where the Court has determined that the government need outweighs the individual interest, the Court has allowed warrantless searches and seizures without probable cause — for example, with only reasonable suspicion or in some cases even with no individualized suspicion.[2]
*1153 A
We would hold that the gun evidence in this case is admissible because unzipping Askew’s jacket to search for a weapon in his waist area was an objectively reasonable protective step to ensure officer safety after Askew’s resistance to the initial Terry frisk attempt.
In Terry v. Ohio, the Supreme Court held that the police — without a warrant and based on reasonable suspicion that an individual committed, was committing, or was about to commit a crime — may stop the suspect for further investigation and conduct a protective frisk for weapons or other instruments of assault. 392 U.S. at 19-27, 88 S.Ct. 1868. The Supreme Court has allowed protective frisks during Terry stops because police officers are at great risk during those encounters. See, e.g., Michigan v. Long, 463 U.S. 1032, 1052, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The Court has explained that the Fourth Amendment does not require officers to choose between investigating criminal activity and avoiding violent attack. On the contrary, “it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.” Terry, 392 U.S. at 23, 88 S.Ct, 1868. A “policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect.” Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
Those cases and principles have led courts to establish what by now is a well-settled corollary to the Terry frisk doctrine; When a suspect hinders the police from adequately performing the initial Terry frisk, officers may protect themselves by following up with reasonable steps to determine whether the suspect is concealing a weapon. See Maj. Op. at 1144 (“[W]e do not dispute that a protective search may be lawful when a suspect prevents the police from performing a Terry frisk... ,”).[3]
*1154 In analyzing whether the police here could unzip Askew’s jacket as a protective step to ensure officer safety, we are not limited to examining the officer’s subjective intent (which, according to the testimony, was to facilitate the show-up). Rather, we consider whether the officer had objectively reasonable grounds to unzip Askew’s jacket for purposes of officer safety. See Terry, 392 U.S. at 21-22, 88 S.Ct. 1868; cf. Whren v. United States, 517 U.S. 806, 812-13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); Scott v. United States, 436 U.S. 128, 136-38, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). As then-Judge Roberts explained, the “propriety of a search under the Fourth Amendment depends on an objective assessment of the officer’s actions in light of the facts and circumstances confronting him at the time and not on the officer’s own subjective intent in executing the search.” United States v. Holmes, 385 F.3d 786, 790 (D.C.Cir.2004) (internal quotation marks and citation omitted); see also United States v. Jackson, 415 F.3d 88, 91 (D.C.Cir.2005) (“[Officers’ actual motives for conducting the search are not relevant as long as their actions were objectively reasonable.”) (internal quotation marks and alterations omitted); United States v. McKie, 951 F.2d 399, 402 (D.C.Cir.1991) (“[W]e are not limited to what the stopping officer says or to evidence of his subjective rationale. ...”). The majority agrees that the officers’ subjective intent is not relevant. Maj. Op. at 1142 (“[W]e agree that the standard for determining reasonableness in the Fourth Amendment context is an objective one.”).
Applying those settled principles to this case is straightforward. Askew concedes that, based on the victim’s description, the police had reasonable suspicion to believe he just committed an armed robbery. The police officers also knew at the moment of unzipping that Askew had resisted the initial frisk attempt and tried to prevent them from feeling his waist area. Because of Askew’s resistance and evasive movements, the officers had an objectively reasonable basis to protect themselves by unzipping Askew’s jacket to determine whether Askew was concealing a weapon at his waist area — which, in fact, he was.
It bears emphasis that the officers did not skip the Terry frisk and immediately unzip Askew’s jacket. Cf. Adams, 407 U.S. at 147-48, 92 S.Ct. 1921; United States v. Casado, 303 F.3d 440, 447-48 (2d Cir.2002); United States v. Vaughn, 1994 WL 119002, at *1-2 (D.C.Cir.1994). On the contrary, the officers started with the Terry frisk. After a suspect actively attempts to impede a frisk, as Askew did here, it is entirely reasonable and proportional for officers to conduct a targeted and limited search for weapons. Cf. Adams, 407 U.S. at 147-48, 92 S.Ct. 1921. Such a two-step approach represents textbook compliance with the requirements of Terry. See id. On the facts of this case, therefore, unzipping Askew’s jacket to search for a weapon in his waist area was an objectively reasonable protective step to ensure officer safety during the Terry stop.
Part III(E) of Judge Edwards’s opinion, which on this point is for a majority, reads the record of this case differently. According to the majority, the District Court found that the officers completed the frisk after Askew’s interference, and that Askew’s interference therefore could not justify any follow-up protective search. But the problem for the majority opinion is that the District Court made no such finding. On the contrary, the District Court expressly recounted Officer Willis’s testimony that, at the time of the unzipping, “Officer Koenig had not completed the pat-down, perhaps because of some resistance by the defendant.” United States v. Askew, 313 F.Supp.2d 1, 3 n. 2 (D.D.C.2004). *1155 The District Court gave no indication that it did not credit Officer Willis’s testimony. And we see no reason why the District Court would have explicitly recited this testimony while somehow intending to implicitly discredit it; that interpretation of the District Court’s opinion frankly does not make sense. The fact that Askew impeded Officer Koenig’s attempts to pat him down is otherwise uncontroverted in the record. Officer Willis’s testimony thus establishes that, at the time of the unzipping, the officers’ initial frisk was not complete, and the officers’ concern about Askew’s interference with the initial frisk attempt had not dissipated.
The majority nonetheless refers to what it calls the “total implausibility” of a scenario whereby the police would have walked “toward the complainant with an unhandcuffed robbery suspect who has successfully prevented them from completing a frisk of his person for weapons.” Maj. Op. at 1143, 1142. But the majority’s replay-booth-like review does not acknowledge how quickly the events transpired; the unzipping of the jacket occurred within seconds of Askew’s resistance and simultaneously with the show-up — all while the victim remained in the police cruiser. The majority has had months to unpack and second-guess those split-second police decisions. The officers did not have that luxury. Events do not unfold in super slow motion in the real world in which police officers operate. Moreover, with respect, it’s the majority’s version of events that is implausible: The majority claims that the police completed a full frisk of Askew after Askew initially resisted, yet still somehow failed to discover the loaded .38 caliber gun at his waist. The majority’s conclusion thus necessarily rests on an assumption that the officers here were dangerously incompetent. We see no basis, however, for such an assumption.
In an effort to bolster its strained reading of the factual record, the majority tries to suggest that the Government has not pressed the protective search argument, as if the Government somehow conceded the point. That is inaccurate. The Government argued before the District Court that the unzipping was a reasonable protective step to ensure officer safety; indeed, that was the Government’s primary contention. See Additional Case Law in Support of Government’s Opposition to Defendant’s Motion to Suppress Tangible Evidence at 2-5, United States v. Askew, 313 F.Supp.2d 1 (D.D.C.2004). After the District Court expressed its preliminary belief that the unzipping of Askew’s jacket was better justified on a show-up rationale, the Government instead focused on that alternative argument, which ultimately was the sole basis for the District Court’s ruling. The Government never conceded the search was not justified as a protective search. On the contrary, the Government continues to support this officer safety rationale: “Given that appellant had successfully resisted an officer’s ‘continued’ attempts to conduct a more traditional pat-down, it was objectively reasonable for the police to unzip appellant’s jacket to determine whether he had a weapon in his waist area.” Gov’t Supp. En Banc Br. at 11.
All of that said, our fact-based disagreement with the majority on the protective search issue simply underscores that, at least as to that question, this is a routine, fact-bound Fourth Amendment case where different Judges happen to interpret the evidence and the District Court’s opinion differently.[4] In other words, the majori *1156 ty’s protective search analysis works no change in and does no harm to Circuit precedent on the permissibility of protective searches following a suspect’s interference with a Terry frisk. See Maj. Op. at 1143 (“[W]e do not dispute that a protective search may be lawful when a suspect prevents the police from performing a Terry frisk.... ”).
B
As an alternative basis for upholding the search and affirming the conviction, we would conclude that unzipping Askew’s jacket was a reasonable investigative step to facilitate the show-up procedure. In our judgment, the police may reasonably maneuver a suspect’s outer clothing, such as removing a suspect’s hat or sunglasses or unzipping a suspect’s outer jacket, when doing so could help facilitate a witness’s identification at a show-up during a Terry stop.
In Terry v. Ohio and Sibron v. New York, the Supreme Court held that the police may forcibly stop a suspect without probable cause if they have reasonable suspicion of a crime. See Terry, 392 U.S. at 21-23, 88 S.Ct. 1868; Sibron, 392 U.S. 40, 63-64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). In explaining the permissible contours of a Terry stop, the Court stated that the officer’s actions during the stop must be “reasonably related in scope to the circumstances which justified the interference in the first place.” Terry, 392 U.S. at 20, 88 S.Ct. 1868. Applying that standard, the Court then considered whether police may search a suspect during a Terry stop by conducting (i) a protective frisk for weapons or instruments of assault that could be used to harm officers or (ii) an “exploratory search” for contraband or evidence of crime possessed by the suspect. See id. at 24-31, 88 S.Ct. 1868. The Court permitted the police to perform protective frisks for weapons or other instruments of assault, finding that the government interest in officer safety outweighed the individual privacy interest. See id.; see also Adams, 407 U.S. at 146, 92 S.Ct. 1921; cf. Sibron, 392 U.S. at 65, 88 S.Ct. 1889. But the Court prohibited, in the absence of probable cause, what the Court has variously called “exploratory,” “evidentiary,” or “full” searches for contraband or evidence of crime that the suspect might be carrying.[5]
A search that consists of unzipping a suspect’s outer jacket to help facilitate a show-up cannot be pigeonholed into either of the two categories of police procedures addressed in Tern/. Rather, such a search *1157 falls into a third category: “identification procedures.” Identification procedures seek to match a suspect to a crime or crime scene and include, for example, fingerprints, palm prints, footprints, body measurements, saliva samples, hair samples, fingernail samples, fingernail scrapings, lineups and show-ups, photographs, voice samples, and handwriting samples. See Model Code of Pre-Arraignment Procedure § 170.1 (1975). Many such “identification procedures” constitute “searches” for purposes of the Fourth Amendment. Because identification procedures do not seek to uncover weapons, they are not the protective frisks that Terry permits. Cf. Terry, 392 U.S. at 24-31, 88 S.Ct. 1868. But because identification procedures do not seek to uncover contraband or evidence of crime possessed by the suspect, they also are not the exploratory searches that Terry prohibits. Cf. Minnesota v. Dickerson, 508 U.S. 366, 378, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); Sibron, 392 U.S. at 64-66, 88 S.Ct. 1889.
Applying the bedrock Terry principle that the police, with reasonable suspicion, may “stop the person for a brief time and take additional steps to investigate further,” the Supreme Court has permitted a variety of identification procedures during Terry stops. Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). The Court has held that police may conduct show-ups, compel suspects to provide their identification, search a suspect’s car to see the vehicle identification number, and take fingerprints. See Michigan v. Summers, 452 U.S. 692, 701 n. 12, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (show-ups); Hiibel, 542 U.S. at 185-89, 124 S.Ct. 2451 (identification); Hensley, 469 U.S. at 229, 234, 105 S.Ct. 675 (identification); New York v. Class, 475 U.S. 106, 119, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (vehicle identification number); Hayes v. Florida, 470 U.S. 811, 817, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) (fingerprinting); cf. Davis v. Mississippi, 394 U.S. 721, 727-28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (fingerprinting). The Supreme Court has authorized those various identification procedures during Terry stops — that is, without a warrant or probable cause — so long as the procedures were reasonable under the circumstances. In no case has the Supreme Court prohibited an identification procedure during a Terry stop.
Askew argues, however, that only those identification procedures that do not constitute Fourth Amendment “searches” are permissible during Terry stops. We disagree.
1
In Hayes v. Florida, the Supreme Court authorized fingerprinting during Terry stops “if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect’s connection with that crime, and if the procedure is carried out with dispatch.” 470 U.S. at 817, 105 S.Ct. 1643. In reaching that conclusion, the Court recognized that fingerprinting is a Fourth Amendment search, albeit a “much less serious intrusion upon personal security than other types of searches and detentions.” Id. at 814, 105 S.Ct. 1643 (emphasis added); see generally Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Hayes thus stands for the proposition that an identification procedure constituting a search is permissible during a Terry stop if the procedure is reasonable under the circumstances.
Askew dismisses the import of Hayes by suggesting that fingerprinting is not a search. Askew’s position ignores the Hayes language comparing fingerprinting to “other types of searches and detentions.” Hayes, 470 U.S. at 814, 105 S.Ct. 1643 (emphasis added). Moreover, if As *1158 kew were correct, the Supreme Court could not have limited fingerprinting during Terry stops to cases where the police have a “reasonable basis for believing that fingerprinting will establish or negate the suspect’s connection with that crime.” Id. at 817, 105 S.Ct. 1643. In other words, if fingerprinting were not a search, the police would not have to make any showing to take fingerprints during any — or indeed every — Terry stop. That is obviously not what Hayes held; in fact, Hayes said just the opposite.[6]
In their separate opinion in Hayes, Justices Brennan and Marshall similarly interpreted the Court’s majority opinion to allow a search (fingerprinting) without probable cause during a Terry stop. They strenuously objected to this result, however, because they argued — as Askew does here — that the only search permitted during a Terry stop is a protective frisk for weapons. They complained that on-site fingerprinting involves “a singular intrusion on the suspect’s privacy” that is not “justifiable (as was the patdown in Terry) as necessary for the officer’s protection.” Id. at 819, 105 S.Ct. 1643 (Brennan, J., concurring in judgment). Indeed, they labeled the majority’s conclusion a “regrettable assault on the Fourth Amendment.” Id. Of course, Justices Brennan and Marshall could call the Hayes majority opinion a “regrettable assault on the Fourth Amendment” only because the decision permitted a search (fingerprinting) on less than probable cause.
Askew also tries to discount the Supreme Court’s reasoning in Hayes as dicta. But the Supreme Court has treated this language from Hayes as authoritative. See Hiibel, 542 U.S. at 188-89, 124 S.Ct. 2451. Moreover, the Court’s analysis in Hayes was carefully considered; indeed, it *1159 was the point of strenuous disagreement between the Hayes majority and Justices Brennan and Marshall in their separate opinion. We have said that “carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.” United States v. Dorcely, 454 F.3d 366, 375 (D.C.Cir.2006) (internal quotation marks omitted); see also Sierra Club v. EPA, 322 F.3d 718, 724 (D.C.Cir.2003); Natural Res. Def. Council, Inc. v. NRC, 216 F.3d 1180, 1189 (D.C.Cir.2000); United States v. Oakar, 111 F.3d 146, 153 (D.C.Cir.1997).
Hayes establishes that the identification procedure used in Askew’s case was reasonable under the Fourth Amendment. Here as in Hayes, the identification procedure constituted a search. Here as in Hayes, the purpose of the identification procedure was to match a suspect with a serious crime that had just occurred and thereby protect the public from a violent criminal at large (a rapist in Hayes; an armed robber here). Here as in Hayes, the police had an objectively reasonable basis for believing that the identification procedure could help establish or negate the suspect’s connection with a crime. Here as in Hayes, the intrusion on the suspect was relatively minimal; indeed, many people would think having their fingerprints taken on the street in plain view of the public is far more intrusive than having their outer jacket partially unzipped. Here as in Hayes, the police action was carried out with dispatch.
Contrary to Askew’s suggestion, moreover, Hayes is no outlier. In New York v. Class, 475 U.S. 106, 118-19, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), the Supreme Court allowed the police during a Terry stop to conduct a limited search of a car so that they could see the car’s vehicle identification number (VIN) — even though the search was not a protective search for weapons as permitted in Terry or Michigan v. Long, 463 U.S. at 1049, 103 S.Ct. 3469. In her opinion for the Court, Justice O’Connor succinctly described the issue and holding:
In this case, we must decide whether, in order to observe a Vehicle Identification Number (VIN) generally visible from outside an automobile, a police officer may reach into the passenger compartment of a vehicle to move papers obscuring the VIN after its driver has been stopped for a traffic violation and has exited the car. We hold that, in these circumstances, the police officer’s action does not violate the Fourth Amendment.
Class, 475 U.S. at 107, 106 S.Ct. 960; see also id. at 132, 106 S.Ct. 960 (White, J., dissenting) (majority opinion “in effect holds that a search of a car for the VIN is permissible whenever there is a legal stop”).
The reasoning of Class is murky in some places. But the bottom line of Class is crystal clear: During a Terry car stop, the police may conduct a limited search of the vehicle so as to see the VIN, even though they are not searching for a weapon. The decision in Class, like the opinion in Hayes, refutes Askew’s position that the police may not conduct a reasonable search for identification purposes during a Terry stop.
Also instructive is the Supreme Court’s decision in Hiibel v. Sixth Judicial District Court, 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). Unlike Hayes and Class, Hiibel did not directly involve a search, but it nevertheless underscored the importance of identification procedures during Terry stops. The Court held that police during Terry stops may compel suspects to provide their names and, pursuant to state law, may arrest suspects who refuse to do so, in which case the police necessarily may conduct a full search incident to arrest that would uncover the sus *1160 pect’s license or other form of identification. Id. at 185-88, 124 S.Ct. 2451; cf. State v. Flynn, 92 Wis.2d 427, 285 N.W.2d 710, 719 (1979) (allowing search for wallet with identification during Terry stop). The Hiibel Court explained that obtaining a person’s identification during a Terry stop is a “commonsense inquiry” that “serves important government interests”: It may “inform an officer that a suspect is wanted” or may “help clear a suspect and allow the police to concentrate their efforts elsewhere.” 542 U.S. at 189, 186, 124 S.Ct. 2451. The Court emphasized that the request for identification “does not alter the nature of the stop itself: it does not change its duration or its location.” Id. at 188, 124 S.Ct. 2451 (citations omitted). In response to concerns about police harassment, the Court noted that the police must have a reasonable basis for stopping the suspect and, indeed, cited Hayes for the proposition that “Terry may permit an officer to determine a suspect’s identity by compelling the suspect to submit to fingerprinting only if there is ‘a reasonable basis for believing that fingerprinting will establish or negate the suspect’s connection with that crime.’ ” Id. (quoting Hayes, 470 U.S. at 817, 105 S.Ct. 1643). Hiibel thus reinforces what Hayes and Class previously stated: Identification is a critical and legitimate component of Terry stops.
Consistent with the Supreme Court’s precedents, a number of state legislatures and courts have long allowed law enforcement officers — with less than probable cause — to conduct identification procedures that constitute Fourth Amendment searches. See Ariz.Rev.Stat. Ann. § 13-3905; Colo. R.Crim. P. 41.1; Idaho Code Ann. § 19-625; Iowa Code Ann. §§ 810.1 to .8; N.J. Ct. R. 3:5A; N.C. Gen.Stat. Ann. §§ 15A-271 to -274; Vt. R.Crim. P. 41.1; State v. Rodriguez, 186 Ariz. 240, 921 P.2d 643, 650-51 (1996) (en banc); People v. Madson, 638 P.2d 18, 31-33 (Colo.1981) (en banc); Wise v. Murphy, 275 A.2d 205, 213-16 (D.C.1971); Bousman v. Iowa Dist. Court, 630 N.W.2d 789, 796-99 (Iowa 2001); State v. Hall, 93 N.J. 552, 461 A.2d 1155, 1159-61 (1983); In re Fingerprinting of M.B., 125 N.J.Super. 115, 309 A.2d 3, 6-7 (App.Div.1973); In re Order Requiring Fingerprinting of a Juvenile, 42 Ohio St.3d 124, 537 N.E.2d 1286, 1288-89 (1989); In re Nontestimonial Identification Order Directed to R.H., 171 Vt. 227, 762 A.2d 1239, 1243-47 (2000). Most of those state rules and decisions broadly authorize the police to obtain a court order — based only on reasonable suspicion — to seize a suspect, compel the suspect’s appearance at the police station or other location, and forcibly require the suspect to submit to an intrusive identification procedure. The Model Code of Pre-Arraignment Procedure similarly permits police based only on reasonable suspicion to obtain a court order, seize a suspect, and compel the suspect to submit to an identification procedure. Model Code of Pre-Arraignment Procedure § 170.2. Professor LaFave generally approves of these rules and decisions because certain “identification searches” do not “require the rummaging through a suspect’s personal effects as does an ordinary full-blown search.” 4 LaFave, Search and Seizure § 9.8(b), at 730 (internal quotation marks omitted). For that reason, Professor LaFave says: “Taking fingernail scrapings, for example, is a search, but yet is a very limited intrusion, and thus should be deemed permissible ” even without probable cause. Id. (internal quotation marks omitted and emphasis added).[7]
*1161 In sum, the Supreme Court’s precedents, the various state laws and decisions, the Model Code of Pre-Arraignment Procedure, and the views of the leading Fourth Amendment scholar all demonstrate that Askew’s extreme interpretation of the Fourth Amendment is seriously-flawed. Identification procedures constituting searches are permitted during Terry stops so long as the procedures are reasonable under the circumstances. Police may therefore reasonably maneuver a suspect’s outer clothing — such as removing a suspect’s hat or sunglasses or unzipping a suspect’s outer jacket — when doing so could help facilitate a witness’s identification at a show-up during a Terry stop. For that reason, it was reasonable for the police to unzip Askew’s outer jacket so that the robbery victim could see his clothing and get a better view of his blue sweatshirt.
2
Askew argues that post -Terry decisions such as Hayes, Class, and Hiibel, as well as the various state statutes, rules, and opinions, do not resolve this case. For the reasons stated above, Askew’s argument is wrong. But even absent all of those precedents and laws — in other words, based solely on Terry and general Fourth Amendment principles — Askew errs in arguing that the police are prohibited during Terry stops from conducting identification procedures constituting searches.
In “evaluating the validity of an officer’s investigative or protective conduct under Teiry, the touchstone of our analysis is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen’s personal security.” Long, 463 U.S. at 1051, 103 S.Ct. 3469 (internal quotation marks and alterations omitted). The police action during a Terry stop must be “reasonably related in scope to the circumstances which justified the interference in the first place.” Terry, 392 U.S. at 20, 88 S.Ct. 1868; see also Hensley, 469 U.S. at 228, 105 S.Ct. 675 (reasonableness test “balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion”); Bell, 441 U.S. at 559, 99 S.Ct. 1861. Applying that standard, Terry says it is reasonable to frisk the suspect for weapons and unreasonable to search the suspect for contraband or evidence. The precise question in this case — again, assuming cases like Hayes, Class, and Hiibel do not already resolve it — is whether it is reasonable for the police to conduct identification procedures.
On the government interest side of the Fourth Amendment balance, when the police seek to conduct an identification procedure at a Terry stop, they know that a serious crime recently has been committed — usually a violent crime such as murder, rape, robbery, or assault — and that the perpetrator is on the loose. In such cases, speed is often of the essence, and tools to quickly establish or negate a suspect’s connection with the crime are essential so that the police can determine whether to arrest the suspect or move on to someone else. Identification procedures at Terry stops therefore help to protect the public from violent criminals at large— an interest Judge Edwards’s opinion never mentions.
On the other side of the Fourth Amendment balance, the primary intrusion on a suspect’s individual privacy during a Terry stop results from the forcible stop itself *1162 and the initial protective frisk. The additional step of conducting a targeted identification procedure — such as unzipping an outer jacket during a show-up — is certainly an interference with individual privacy. But it is a relatively minimal interference, especially as compared to numerous other searches that the Supreme Court has authorized without probable cause. Cf. Knights, 534 U.S. at 119-22, 122 S.Ct. 587 (search of home); Vernonia Sch. Dist. 17J v. Acton, 515 U.S. 646, 653-65, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (urinalysis); Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 667-77, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (urinalysis); Skinner v. Ry. Labor Executives’ Ass’n, 489 U.S. 602, 620-34, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (blood, breath, and urine testing); O’Connor v. Ortega, 480 U.S. 709, 722-26, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (search of employee’s office); Class, 475 U.S. at 114-119, 106 S.Ct. 960 (search of part of interior of defendant’s car); New Jersey v. T.L.O., 469 U.S. 325, 340-42 & n. 8, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (search of student); Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (driver asked to get out of car during Terry stop “is being asked to expose to view very little more of his person than is already exposed”).
When balancing the competing interests, the consequences of accepting Askew’s argument are important to consider. Prohibiting the police during Terry stops from conducting identification procedures that constitute searches would lead to absurd and dangerous results. It would mean that the police could not remove a suspect’s gloves to perform the fingerprinting that Hayes expressly allows. It would mean that the police could not remove a robbery suspect’s hat during a show-up after an armed robbery. It would mean that the police could not take off a suspected bank robber’s ski mask. It would mean that the police could not remove a murder suspect’s shoe to take a shoe imprint during a Terry stop, even though a shoeprint was the key evidence at a murder scene. Cf. State v. Moffatt, 450 N.W.2d 116, 120 (Minn.1990). It would mean that the police could not lift a rape suspect’s sleeve to view a tattoo on the suspect’s forearm, even though the rape victim said the perpetrator had a distinctive tattoo on his forearm. It would mean that the police could not take a hair sample from a rape suspect during a Terry stop, even though the key piece of evidence at the rape scene was a hair from the perpetrator. Cf. United States v. Ingram, 797 F.Supp. 705, 716-18 (E.D.Ark.1992). It would mean that the police during a Terry stop could not take fingernail scrapings or a saliva swab from a murder suspect in a case where the victim was killed in a violent struggle. Cf. In re Shabazz, 200 F.Supp.2d 578, 584-85 (D.S.C.2002). It would mean that a show-up is all but useless in certain cases, notwithstanding that the Supreme Court has long blessed show-ups during Terry stops. It would mean that a large number of state statutes, rules, and decisions permitting identification procedures on less than probable cause — which have been on the books for decades — are all unconstitutional and wrongly decided. In short, Askew’s position would hamstring the police and prevent them from performing reasonable identification procedures that could solve serious crimes and protect the community from violent criminals at large.[8]
*1163 For those reasons, even if the Hayes-Class-Hiibel line of cases did not exist, the government need for identification procedures during Terry stops outweighs the intrusion on individual privacy.[9]
We would hold that the police may conduct reasonable identification procedures at Terry stops; in particular, the police may reasonably maneuver a suspect’s outer clothing — such as removing a suspect’s hat or sunglasses or unzipping a suspect’s outer jacket — when, as here, doing so could help facilitate a witness’s identification at a show-up during a Terry stop. But we recognize, of course, that there is not a majority of the Court on the show-up issue for either our position or Judge Edwards’s position as reflected in Part III(A)-(C) of his opinion. As a result, the legal question about the permissible scope of police activity at show-ups that we granted en banc review to decide remains undecided for now in this Circuit.
C
We close with a few observations about Part III(D) of Judge Edwards’s opinion, which consists of just a single, fact-bound paragraph that constitutes the entirety of the binding opinion of the Court on the show-up issue.[10]
That paragraph assumes arguendo that the police may “unzip a suspect’s jacket to facilitate a show-up if, inter alia, ‘there is a reasonable basis for believing’ that doing so ‘will establish or negate the suspect’s connection with the crime’ under investigation.” Maj. Op. at 37 (quoting Hayes, 470 U.S. at 817, 105 S.Ct. 1643 (alteration omitted)). But the paragraph then decides that the police in this case did not have a sufficient factual predicate to meet this standard. We disagree. It is generally reasonable for police to believe that unzipping a suspect’s outer jacket could help facilitate a robbery witness’s identification at a show-up. Even if a witness can readily see a suspect’s face, allowing the witness to view the suspect’s clothing would enhance the accuracy of the identification. That is particularly true where, as here, the witness had identified a specific item of the perpetrator’s clothing when first reporting the crime, and the suspect appeared to be wearing that clothing under his outer jacket.
Because the robbery victim here specified a blue sweatshirt when she first reported the crime, the officers reasonably believed that the sweatshirt was a significant identifying factor for the victim. Officer Willis testified: “I remember they said the defendant had on a blue hooded sweatshirt, but [Askew] had his jacket zipped up. I wanted the complainant to see what he had on to make sure that he wasn’t zipping nothing up to cover up.... [I] wanted to expose the blue hooded sweatshirt to the victim to make sure that that’s what she saw.” Mar. 26 Tr. at 8-9.
The police’s belief was reasonable, moreover, even though the victim, when she *1164 first reported the crime, apparently did not indicate whether the perpetrator’s sweatshirt had distinctive markings. The majority suggests that there was insufficient justification for allowing the victim to see Askew’s sweatshirt because it would have been impossible for her to distinguish a “generic blue sweatshirt” from others. Maj. Op. at 1140-41. But just because the victim did not mention a distinctive characteristic of the sweatshirt in her initial description doesn’t mean allowing her to see Askew’s sweatshirt would have been futile for identification purposes. The majority ignores the obvious point that there are numerous styles of “blue sweatshirts,” and any shade, material, logo, pattern, or feature could have helped the victim match or distinguish Askew’s sweatshirt from the one she recalled being worn by the robber. As the Government correctly notes, a “blue sweatshirt” could be “cotton or fleece, zippered or buttoned; and it could have pockets or a hood.” Gov’t Supp. En Banc Br. at 4 n. 1. A “blue sweatshirt” could feature, among countless other things, an athletic company logo, a college mascot, a professional sports team name, or a corporate slogan. To be sure, a “blue sweatshirt” could also have none of those things, presumably rendering it the kind of plain old “generic blue sweatshirt” that the majority describes. But what is “generic blue”? One major manufacturer of sweatshirts lists 14 wildly variant shades of this “generic” color: Aqua, Baltic Blue, Blue, Cadet Blue, California Blue, Cornflower Blue, Granite Blue, Light Blue, Medium Stonewash, North Carolina Blue, Periblue, True Navy, True Royal, and Vintage Navy. See Jerzees Color Translation, at http://www.jerzees.com/jerzeesactivewear/ ColorTranslation.aspx. If the robber’s “generic blue” sweatshirt had been “North Carolina Blue” but Askew’s was “True Navy,” that would have been the end of the matter and Askew would have walked. Or the victim alternatively might have said, “that’s the sweatshirt and that’s the robber.”
The irony here, moreover, is that seeing the sweatshirt may actually have helped the victim rule Askew out as the robber. Keep in mind that the end result of the show-up was that the robbery victim said Askew was not the right guy. The only reason unzipping the outer jacket to see the sweatshirt proved problematic for Askew is the inconvenient fact that he was illegally carrying a loaded .38 caliber gun under his jacket.
The larger point is that Hayes requires only a “reasonable basis for believing” that the identification procedure will establish or negate the suspect’s connection with the crime. Hayes, 470 U.S. at 817, 105 S.Ct. 1643. Given that the robbery victim initially told the police about the blue sweatshirt, how can we say that there is not even a reasonable basis for believing that the victim’s seeing the blue sweatshirt would have assisted her identification? The majority offers no good answer to that commonsense question.[11]
In our judgment, requiring this kind of pinpoint accuracy and detail in a victim’s initial description of a criminal is inconsistent with the Hayes “reasonable basis” standard and could place a dangerous burden on law enforcement officials. After all, victims often do not provide such richly detailed descriptions when first reporting violent crimes to the police.
*1165 A good indication that Part III(D) rests on quicksand is the fact that Askew himself did not raise this argument either in his submission to the District Court or on appeal, where he was represented by skilled and experienced counsel from the Federal Public Defender’s Office. Defense counsel presumably considered the argument untenable.[12]
In any event, our disagreement with Part III(D) of Judge Edwards’s opinion (which on this point is for a majority) is a narrow fact-bound dispute with respect to the record in Askew’s specific case. In many future show-up cases, the record indisputably will satisfy the Hayes reasonable-basis requirement as described by Part III(D) of that opinion. In such a case, of course, the Court would need to decide the legal issue regarding show-ups that the Court today leaves open.
One final point: The majority’s ruling in Part III(D), as we read it, is limited to a witness’s viewing clothing at a show-up during a Terry stop. The majority does not purport to address or alter long-standing law about what is sufficient to constitute “reasonable suspicion” to stop someone in the first place. If the majority’s analysis were to migrate to that context, then it would of course wreak havoc with Terry stops more generally. We do not read the majority opinion to open that can of worms. Indeed, various judges in the majority have joined recent opinions suggesting there will be no such spillover effect. See United States v. Abdus-Price, 518 F.3d 926, 929-31 (D.C.Cir.2008) (Griffith, J., joined by Ginsburg and Rogers, JJ.); United States v. Goddard, 491 F.3d 457, 462 (D.C.Cir.2007) (per curiam) (Ginsburg and Tatel, JJ.); see also Douglas H. Ginsburg, Of Hunches and Mere Hunches: Two Cheers for Terry, 4 Geo. Mason J.L. Econ. & Pol’y 79, 84 (2007) (“Under Terry, the test for determining whether a police officer had a reasonable suspicion takes account of the ‘totality of the circumstances,’ which leads courts to review police practices deferentially. As a result, close calls go to the police.”) (footnote omitted).
We would hold that unzipping Askew’s jacket to search for a weapon in his waist area was an objectively reasonable protective step to ensure officer safety after Askew’s resistance to the initial frisk attempt. In the alternative, we would hold that the police may reasonably maneuver a suspect’s outer clothing — such as unzipping a suspect’s outer jacket — when, as here, doing so could help facilitate a witness’s identification at a show-up during a Terry stop. We would uphold the search and affirm the judgment of conviction on either of those two alternative grounds. We respectfully dissent.

. See also Illinois v. McArthur, 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (Fourth Amendment's “central requirement is one of reasonableness.”) (internal quotation marks omitted); Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (“We have long held that the touchstone of the Fourth Amendment is reasonableness.”) (internal quotation marks omitted); Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (“The Fourth Amendment does not proscribe all state-initiated *1152 searches and seizures; it merely proscribes those which are unreasonable.”); Pennsylvania v. Mimms, 434 U.S. 106, 108-09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) ("The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.”) (internal quotation marks omitted); Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L.Rev. 757, 759 (1994) ("We need to read the Amendment's words and take them seriously: they do not require warrants [or] probable cause, ... but they do require that all searches and seizures be reasonable.”).

. For cases involving warrantless searches without probable cause, see, e.g., United States v. Knights, 534 U.S. 112, 119-22, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (allowing search of probationer's home on reasonable suspicion); Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653-65, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (upholding school's policy of suspicionless drug testing of student athletes); Nat’l Treasury Employees Union v. Von Raab, 489 U.S. 656, 667-77, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (allowing suspicion-less urinalysis of United States Customs employees who applied for promotions); Skinner v. Ry. Labor Executives’ Ass’n, 489 U.S. 602, 620-34, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding suspicionless urine, blood, and breath testing of railroad employees); O’Connor v. Ortega, 480 U.S. 709, 722-26, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (allowing search of government employee’s office on reasonable suspicion that search would produce evidence of work-related misconduct); New Jersey v. T.L.O., 469 U.S. 325, 340-42 & n. 8, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (permitting school authorities to search student upon reasonable grounds for suspecting violation of school rule); New York v. Belton, 453 U.S. 454, 459-62, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (allowing searches incident to lawful arrest without additional justification); cf. Camara v. Mun. Court, 387 U.S. 523, 534-40, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (allowing warrantless administrative searches by municipal health and safety inspectors). For cases involving warrantless seizures without probable cause, see, e.g., Illinois v. Lidster, 540 U.S. 419, 427-28, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (allowing suspicionless stops of motorists to seek information regarding recent hit-and-run accident); Michigan v. Sitz, 496 U.S. 444, 451-55, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (upholding highway sobriety checkpoint without any individualized suspicion); Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (allowing stop of vehicle to check license and registration on reasonable suspicion that motorist is unlicensed or automobile is unregistered); Mimms, 434 U.S. at 108-11, 98 S.Ct. 330 (allowing officers conducting traffic stop to order driver out of car even if they lack particularized reason for believing driver possesses a weapon); United Stales v. Martinez-Fuerte, 428 U.S. 543, 557-62, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (allowing suspicionless stops at border-control checkpoints).

. See Inouye v. Kemna, 247 Fed.Appx. 915, 917 (9th Cir.2007) (officer justified in reaching into suspect's pockets after suspect evaded frisk); State v. Heitzmann, 632 N.W.2d 1, 9 (N.D.2001) ("Courts have recognized that a more intrusive Terry search may be constitutionally permissible when the detainee attempts to prevent an officer from performing an effective pat-down.”); 4 Wayne R. Lafave, Search and Seizure § 9.6(b) & nn. 190, 194 (4th ed.2004) (collecting cases holding that further search is warranted when suspect resists frisk or makes sudden move toward the place where weapon may be hidden); cf. Adams v. Williams, 407 U.S. 143, 147-48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (officer justified in directly retrieving gun from suspect's waist when suspect did not comply with officer's request to exit car); United States v. Thompson, 597 F.2d 187, 191 (9th Cir.1979) (officer justified in reaching into suspect’s pocket after suspect repeatedly tried to reach into his pocket despite warnings not to and bulky coat prevented officer from determining from pat-down whether pocket contained weapon); United States v. Vaughn, 1994 WL 119002, at *2 (D.C.Cir.1994) (officer justified in forcibly removing suspect’s hands from his pockets after suspect made abrupt movement: "The whole point of a protective search conducted under the aegis of the Terry stop is to secure the officer’s safety while investigating suspected criminal activity. Where a target of a Terry stop makes abrupt movement towards areas of his body that might harbor a weapon, officers have good reason to be wary and to take adequate precautionary measures.”); United States v. Cherry 767 F.Supp. 285, 286 (D.D.C.1991) ("Generally, Terry searches consist of patdowns; however, numerous cases have approved searches without a preceding patdown where the exigent circumstances of the stop justify immediate action by the police. Such cases invariably involve threatening gestures or sudden movements by the person being searched or other conditions which courts have found to be sufficiently exigent to warrant an increased intrusion upon the defendant’s person.”); State v. Roach, 172 N.J. 19, 796 A.2d 214, 219-20 (2002) (officers justified in removing item from suspect’s pants when suspect refused to obey the officers' orders and "continued to move his hands toward the unidentified bulge”).

. It bears mention that this fact-based disagreement between the majority opinion and our opinion likely would have been avoided had the officer who conducted the initial frisk (Officer Koenig) been called to testify at the suppression hearing.

. See Terry, 392 U.S. at 30, 88 S.Ct. 1868 (prohibiting "general exploratory search” aimed at recovering "whatever evidence of criminal activity [officer] might find”); Sibron, 392 U.S. at 64-66, 88 S.Ct. 1889 (distinguishing protective search for weapons from search for narcotics); see also Minnesota v. Dickerson, 508 U.S. 366, 378, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (prohibiting "eviden-tiary search," namely one raising prospect that officer will "rummage and seize at will” beyond "specific authorization” of Terry stop) (internal quotation marks omitted); Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion of White, J.) (“police may not carry out a full search of the person or of his automobile or other effects” during Terry stop); cf. Maryland v. Buie, 494 U.S. 325, 335, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (distinguishing "cursory inspection” from "full search”); Skinner, 489 U.S. at 638, 109 S.Ct. 1402 (Marshall, J., dissenting) (describing past cases: "Only where the government action in question had a substantially less intrusive impact on privacy, and thus clearly fell short of a full-scale search, did we relax the probable-cause standard.”) (internal quotation marks and citation omitted); New York v. Class, 475 U.S. 106, 118-19, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (distinguishing permissible focused search of car's dashboard from full search of passenger compartment); United States v. Jacobsen, 466 U.S. 109, 125 n. 28, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (distinguishing fingernail scrapings from “full search”).

. In a 1973 case, the Supreme Court hinted in dicta that fingerprinting may not be a search. See United States v. Dionisio, 410 U.S. 1, 15, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). The leading Fourth Amendment scholar explains that this "dictum in Dionisio might be considered suspect.” 1 LaFave, Search and Seizure § 2.6(a), at 668. The Court's later decision in Hayes plainly considered fingerprinting a search; the Hayes language and requirement for some evidentiary showing by the police to obtain fingerprints during a Terry stop cannot be explained otherwise. Therefore, although some of the Supreme Court's pre-Hayes language "indicates that a person does not have a reasonable expectation of privacy in his or her fingerprints, which is to say that the police actions of taking a fingerprint would not be a search within the meaning of the Fourth Amendment, in Hayes, the Court signaled that a person has a protected interest, albeit a diminished one, in the taking of his or her fingerprints.” Thomas K. Clancy, What Is a “Search” Within the Meaning of the Fourth Amendment?, 70 Alb. L.Rev. 1, 8 n. 39 (2006). Hayes reflects and is consistent with the modern trend in Supreme Court cases, which increasingly has been to recognize intrusive and invasive police practices as searches— and then to determine whether they are reasonable. See Kyllo v. United States, 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) ("We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search — at least where (as here) the technology in question is not in general public use.”) (internal quotation marks and citation omitted); Bond v. United States, 529 U.S. 334, 337, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) (merely feeling or squeezing a passenger's bag is a search: "Physically invasive inspection is simply more intrusive than purely visual inspection.”); Skinner, 489 U.S. at 616-17, 109 S.Ct. 1402 (breath, blood, and urine collection and testing procedures are searches). The Supreme Court ordinarily no longer engages in the kinds of contortions it once arguably employed to find certain police procedures not to be searches. See Akhil Reed Amar, Fourth Amendment First Pñnciples, 107 Harv. L.Rev. 757, 769, 783-85 (1994) ("To avoid some of the absurdities created by the so-called warrant and probable cause requirements, the Justices have watered down the plain meaning of 'search' and 'seizure.' ”).

. The Supreme Court has often looked to state laws, the Model Code of Pre-Arraignment Procedure, and Professor LaFave's treatise in considering the reasonableness of police practices under the Fourth Amendment. See, e.g., Brendlin v. California, - U.S. -, 127 S.Ct. 2400, 2407-08, 168 L.Ed.2d 132 *1161 (2007) (state court decisions and LaFave); Illinois v. Lidster, 540 U.S. 419, 425, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004) (Model Code of Pre-Arraignment Procedure); Atwater v. City of Lago Vista, 532 U.S. 318, 344-45, 355-60, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (state laws, Model Code of Pre-Arraignment Procedure, and LaFave).

. Askew argues that his position — namely, that only those identification procedures not constituting searches under the Fourth Amendment are permitted during a Terry stop — provides a clear, bright-line rule. But that claim proved hollow at oral argument when Askew's skilled counsel could not answer, perhaps understandably given the state of the case law, numerous questions about whether certain identification procedures *1163 constitute searches under the Fourth Amendment. See Tr. of En Banc Oral Arg. at 3-12.

. A variety of conceivable searches would be more intrusive than the search at issue here. In such hypothetical cases, the Government would face a heavier burden to show that the investigative step was reasonable. See Schmerber v. California, 384 U.S. 757, 769-72, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Helton v. United States, 191 F.Supp.2d 179, 184-85 (D.D.C.2002); see also 4 LaFave, Search and Seizure § 9.8(b), at 730 (“there may be a serious question as to whether the taking of a blood sample should be allowed” on less than probable cause).

. To reiterate; On the show-up issue, Judges Ginsburg and Garland join only the paragraph in Part III(D) of Judge Edwards’s opinion; they do not reach the legal question addressed in Part III(A)-(C) of Judge Edwards’s opinion.

. No doubt because there is no good answer to that question, Judge Griffith, notwithstanding his separate opinion’s narrower view of what police are permitted to do under the Fourth Amendment, does not join Part III(D) of Judge Edwards’s opinion; he agrees with us that, if the Hayes standard applies, the facts here meet the Hayes test. Concurring Op. of Judge Griffith at 1146 n. 2.

. The majority opinion notes that Askew alluded to the blue-sweatshirt point in a footnote in his reply brief to the three-judge panel. Maj. Op. at 1146 n. 2. The fact that the point appeared in one oblique sentence in a reply-brief footnote speaks for itself in terms of defense counsel's confidence in the point. Moreover, contrary to the majority's suggestion, Askew did not make this point as an alternative argument for reversal, but rather only to illustrate why the Court should not allow any identification searches during Terry stops. And even if Askew had offered this as an alternative argument for reversal, this Court of course does not consider alternative arguments for reversal raised for the first time in a footnote in a reply brief.